Good morning, Your Honor. Susan Allison for Sentinel Offender Services, Inc. At the outset, I sort of, unless the court has a different preference, I will cover all three of the issues in the cross appeals, reserving five minutes, if you'd rather. That's not the way it went in the briefing, but if that's fine with you, that's... So, initially, I'd like to address three points relating to the challenge to the trial court's fraud liability findings. This was, the trial court was the trier of fact. She made some significant credibility findings. Those findings are entitled to clear deference from this court. The principal argument that G4S made below on liability was that there was nothing fraudulent about G4S's good probability email, which is principally at issue here. And the reason is that supposedly that Sentinel had asked only for the views of Justice's management about their expectations for the North Carolina bid that was out for consideration. G4S argues that because Justice's CEO, Beach, approved the good probability language, that the email actively reflected the views of Justice's management. This is basically an evidentiary challenge.  First, it ignores the evidence and the court's findings that this affirmative good probability representation was not the sole basis for the fraud finding. The trial court expressly found that the good probability email was compounded by G4S's failure in the course of the negotiation to disclose any facts relating to Justice's own understanding that its bid for the NCDOC contract didn't comply technically with the requirements of the agency. There were three specific respects that Justice was aware were not in compliance. They admitted that noncompliance in communications with the NCDOC, and they never mentioned anything about it. In particular, Blake, Justice's CEO, who is the individual who affirmatively approved the good probability email, he knew about the noncompliance. He had been told about it by Justice's president, Martin. Also, Martin told Jorgensen, when she asked for his input on what to say to Sentinel about the bid, Martin told her that he thought it was only a 40-50% chance that Justice would prevail. And so we have two issues here. We don't have just the affirmative good probability representation. We have it compounded in the evidence by the total nondisclosure of the bid's noncompliance. So G4S's reply on this issue to the nondisclosure issue, which it didn't mention in its brief, was that there was no evidence that G4S knew about the technical noncompliance. This fails from an evidentiary point of view as well. Sentinel did ask for the views of Justice's management. It didn't just ask for what G4S knew. Also, Beach, who approved the probability language, he knew about the noncompliance, and he didn't say anything about it. And again, Martin, too, told Jorgensen that there was only a 40-50% chance, and she ignored that language. Indeed, at Beach's suggestion, she took that language out, and without being asked, she put in her own good probability language and sent it off to Sentinel. So the record, in sum, on that substantiates that the good probability email is not the sole representation at issue, and that Jorgensen, in any event, knew it wasn't true based on the information she'd received. Separately, G4S argues that the good probability email was a non-actionable opinion of future events. The evidence establishes that there are at least three exceptions to that mere opinion rule that apply here and are supported by the evidence. They're discussed in the new vision case and the pace-setter decisions cited in the briefs. The first exception makes it clear that a claimed opinion is actionable if it's made by a party with superior knowledge, and the record clearly shows here that G4S had superior knowledge about the NCDOC in many respects. They redacted the contract when they gave it to them in due diligence. They told them nothing about the bid except that the bid was out there, and they told them only that it was in the top 15 contracts they had When it turned out, it was the single most profitable contract that Justice had. The second exception to the mere opinion rule that's supported by the evidence is that the party expressing the opinion does not, in fact, hold the opinion. And basically, as I've already discussed, we know that Martin didn't hold that opinion, that it was a good probability, and that Beach knew that it was untrue. The third exception is where the statement is an affirmative affirmation, not a casual statement that it's intended to induce reliance. And the evidence shows, and the district court found specifically, that it was not a casually made statement. It was made to induce Sentinel to move forward with the deal. It was made in response to its specific request. I ask you, if you're done with that, can we go to the issue of damages? Sure, sure. Let's do damages. Why did Sentinel rely exclusively on 3333? We actually didn't, Your Honor. As we pointed out in our reply brief on that issue, we argued in our proposed findings both the Alliance and the Stout cases and quoted the language from 3343. But that was on a different point. No, it's on damages. I mean, we argued that the difference in valuation under 3343 was the proper measure. We did mention 3333. G4S argued only 3333. In your proposed findings, on the main damage claims, didn't you primarily and heavily rely on 3333? We did not. We mentioned 3333, and then we also recited the standard from Alliance and the Stout cases, which is the standard in 3343. And the evidence we put in completely tracked the loss of value measure and the additional damage portion of what 3343 provides for. And G4S itself argued 3343. It doesn't mention that in its own briefing. A final point on that issue is that what the proper measure of damages is, is an issue of law for this court, de novo review, and you should straighten that out, the law says, regardless of how it was presented below. So even if you feel there was some confusion in the measure of damages proposed, the court had in front of her both of them. Would you agree that you relied on at least in part on 3333? Isn't that correct? We cited 3333. As being the applicable standard for the general measure of damages. Yes, but we also argued the standard under 3343, and the damages we presented were entirely consistent with 3343. They tracked the two different components that 3343 provides. But now on appeal you're saying the district court erred in relying on 3333. Is that right? That is correct. But you admit you at least relied on 3333, at least in part. At least in part. So how can you say the district judge erred when that was part of your claim at trial? Well, the district court judge had both references to the two different standards before her. And frankly, G4S was arguing 3343, which the judge did not apply. And we presented evidence consistent with 3343. It's the judge's job to get it right, in my opinion. Well, there's the doctrine of invited error. To the extent that it was error to rely on 3333, it seems that Sentinel put the district court in that position. I don't think so, because we discussed 3333 as one measure of fraud damages, and we elaborated with a discussion of what 3343 provides in the alliance in stout cases. I think if you review the proposed findings on that, that's what you'll see. So I disagree that we relied only on 3333 or that we invited error on that issue. Okay. Let me ask you another damage question about mezzanine financing. And I'm going to ask the same question of opposing counsel. But the district judge declined to award mezzanine financing, and you claim that's error. Is that correct? That's correct. All right. Now, first of all, what is the standard of review, and why did the district court err? Well. What is the standard of review in your argument? Well, I think the calculation of the amount of damages is a discretionary issue, but I think whether she applied the wrong standard is a legal issue de novo. And I think she applied the wrong standard because she refused to allow it as additional damage that's provided for under 3343. So that's what it was. If the district judge, she did discuss mezzanine financing and gave reasons for not allowing it, correct? No. She did describe that we went and had to get mezzanine financing. And what the evidence is on that issue is that that was more expensive financing, that we had to get it in essence to make the extra, you know, in order to come up with the entire purchase price. If we hadn't had to pay for the lost MCDOC contract or the value of that contract, if we'd been able to reserve that, we wouldn't have had to get that mezzanine financing necessarily. Well, isn't that at least in part a factual finding? Yes, it is. But to the extent that she rejected it. If it's at least in part a factual finding, isn't it abuse of discretion? Well, I don't think it really qualifies as that. And the reason is the only standard she applied was this, all what she believed to be the damages proximately caused by the defendant's conduct. That's a 3333 standard. That's why she didn't say that the interest was or wasn't allowed on that. She didn't buy into any part of the 3343 valuation methodology that my client used through its expert at trial. She didn't go there. She didn't consider 3343 as how she was going to calculate damages. So I think it's a methodology issue, an issue of law as much as anything. Her actual numbers are obviously abuse of discretion findings. I'd like to turn quickly to the problem with G4S is to the damages the judge did award. There's no basis for them in the record for two reasons. One is she arrived at that measure by concluding that she had to take into consideration in amount of damages what the risk was that we knew about. But the point we made in our briefs, Your Honors, is that the issue of whether there was increased risk and whether we knew about some risk, which we clearly did, is an issue that doesn't go to the amount of damages as a matter of law. It goes to whether you have a material misrepresentation or nondisclosure. It goes to whether it approximately caused some damages. But we negotiated a $13 million price understanding there was some risk and that there was a good probability they'd get the contract because that's what they assured us. In fact, so that risk just goes to whether that was a misrepresentation and whether it approximately caused some damages. Once you determine that, as the Pearson case we cited, then if you decide all those liability elements are met, then you're directed to go to 3343 to figure out the amount of damages. You can't detract from the amount of damages a consideration of risk that is part of the liability findings. So that's the argument we've made on that. And there is no evidence to support the measure the Court adopted. G4S's expert was speculating. He theorized that maybe the parties would have handled it this way without the fraud. Maybe they would have looked at the adjustments that were made in 1.3 of the contract and done it the same way. But there's no evidence to support that they would have done that. And the evidence is that if we'd known about what they withheld from us, we either would have renegotiated the purchase price or we would have insisted on reserving the whole purchase price. That's what the evidence is. Finally, on the attorney's fees, I'll leave myself a little bit less. But on the attorney's fees, basically, the Santisas case and the Maynard case control. The confounding arguments that G4S has made on attorney's fees are based largely on the Sue case. And it doesn't control because it involved only a contract claim. And Santisas and Maynard made clear that where you have a broad contractual attorney's fee provision and you have mixed tort and contract claims, that if you prevail on the tort claim and you lose on the contract claim, then under 1032, the party that gets the net monetary recovery properly recovers those fees. as prevailing party. And that simply stated is the correct damage analysis. It's the analysis the trial court applied. And we think it should be affirmed. Thanks. Thank you. Good morning, Your Honors. Calvin Davis for Appalachian Cross Appellant, G4S. I would begin by asking the panel whether it's permitted for me to reserve rebuttal time since we're also a cross appellant on this matter. But a cross appeal, so sure. Sure. I'd like to reserve five minutes if I could, Your Honors. I'd like to address first the issues we've raised on the cross appeal. The basic background here is that G4S had a subsidiary, Justice Services, who is in the same business as Sentinel Offender Services, which is basically GPS monitoring of offenders, ankle bracelets, wrist bracelets, things of that nature. So G4S was going to sell its subsidiary, Sentinel, a subsidiary Justice to Sentinel. And that transaction occurred in 2012. Prior to the agreement being consummated, the CEO of Sentinel asked the representative of G4S, Susanna Jorgensen, what was Justice's management opinion of the likelihood of some bids that were out there coming in? So just to understand, I think this is important. I think Sentinel's arguments have a tendency to lump together G4S and Justice. To understand, those are separate entities. Even though Justice is a subsidiary of G4S, they're separate corporate entities. There was no allegation of alter ego alleged or found in this case, so they need to be considered separate. G4S, as the parent, had no detailed information about the business operations of Justice. Susanna Jorgensen, the representative of G4S, had no detailed knowledge about the business operations of Justice. That is why when Sentinel's CEO asked, what's going on with some of these bids that are out there, both the president of Sentinel and Ms. Jorgensen knew, you have to ask for the opinion of management of Justice. So when the president of Sentinel asked the question, he said, Susanna, can you get me the opinion of management of Justice on what is going on with some of these outstanding bids? Because part of what was being purchased here is not just the existing business, but there were some bids that were out there that either might come in or not come in. You're arguing that Ms. Jorgensen was credible. The district judgment is a specific finding that she was not credible. So how can we rely on anything she said? I understand completely that was the finding that was made by the district court. The argument we are making here actually does not rely on Ms. Jorgensen's credibility. It relies on undisputed evidence in this file and in the case. There is no evidence of any kind that G4S or Ms. Jorgensen had any specific knowledge about the likelihood of Justice securing the North Carolina Department of Corrections bid. So that is why Ms. Jorgensen has to ask the management of Justice to get the answer to that question. And when you look at the emails here, emails that of course no one ever thought would be exhibits in a trial, you see her trying to get the answer to the question in a very honest and straightforward way. She asks the folks who are running Justice, what are our chances of getting this North Carolina bid? Regardless of any determination about Ms. Jorgensen's credibility, the emails are undisputed, and the fact that G4S and Ms. Jorgensen didn't know anything about what was going on with those North Carolina bids is also undisputed. So she asks the folks who know, the President and the CEO of Justice. And that is exactly the people whose opinions were being asked for by the CEO of Sentinel. Please ask Daryl Martin and Blake Beach, respectively, the President and CEO of Justice, what they think the chances are. So there is an exchange of emails. Daryl Martin and Blake Beach both contribute to the emails. Ms. Jorgensen looks at those emails, decides that there's a good probability, based on what she sees, of Justice securing that North Carolina bid. But she doesn't just stop there, because she's trying to be as honest and straightforward as possible with the information she's presenting. She goes back to Mr. Martin and Mr. Beach, the President and CEO of Justice, and says, does this look right to you? I'm saying good probability. What do you think about that? Blake Beach says, looks good to me. Mr. Martin says, thanks for clarifying on that. And in fact, there's no dispute in this case. Mr. Beach testified at trial. He believed there was a good probability of getting the contract from North Carolina. And not only that, even Sentinel concedes that Mr. Beach, at meetings with Sentinel, was touting how he felt very good about renewing the bid with the North Carolina Department of Corrections, mainly because in this business, being the incumbent is hugely important, and Justice was the incumbent for North Carolina. So given all that, and putting aside any credibility issues, the evidence is undisputed that G4S and Jorgensen did not know the state of the North Carolina contract. Justice did. Sentinel asked for Justice's opinion, and Ms. Jorgensen vetted it repeatedly with Justice to determine what their actual opinion was. What happened here was, respectfully, the district court substituted its own opinion of what a good probability was for the opinion of Justice Management. The question that was asked by Sentinel was, what is the opinion of Justice Management on whether or not we're going to get the North Carolina contract? Don't we have to accept the testimony of Sentinel in the light most favorable to Sentinel? That was the factual findings that the judge made. I think you're ignoring that principle, respectfully. Well, I understand, Your Honor. I think my position is simply that even if you accept Sentinel's testimony— But we have to. Don't we have to? I understood, and I will accept that, Your Honor. Even if you do accept that, there is nothing in Sentinel's testimony that can testify to the internal knowledge of G4S or Susanna Jorgensen for G4S about what was going on with the North Carolina contract. Sentinel can only testify to what they know about, their personal information. And they had no understanding that G4S or Jorgensen knew what was going on with Justice of the North Carolina contract. I think that's where the credibility finding really comes in, because the district court was quite specific that Jorgensen was aware that Martin knew Justice only had a 40 to 50 percent chance of securing the contract. Nobody communicated that to anybody at Sentinel. Instead, they communicated that there was a good probability of getting the contract, and the court was very specific in weighing the explanation that Jorgensen gave at trial as to why she communicated that there was a good probability. That was where the credibility finding, I think, really comes in. Without being present and being able to observe Ms. Jorgensen's demeanor, I don't know how we can question it at this point with the standard review that we have to work with. Understood, Your Honor, and I'll move off of this. In summary, I just want to say that Ms. Jorgensen's credibility doesn't impact this issue. Ms. Jorgensen was asking for the opinion of Justice Management in undisputed e-mails because she didn't have any information. Therefore, whether she's credible or not, she is passing on the opinion of Justice Management, which is all that Sentinel asks for. Therefore, how can that be a misrepresentation? It's really she's just passing on the opinion of those whose opinion was asked for, and it was just basically she was asking as a middle person here, essentially. Regardless of credibility, she's passing on the opinion that is being asked for. Under those circumstances, that can't be misrepresentation. There's no evidence in the record at all. I think if she passed on the information that they only had a 40 percent chance of securing the contract, I think we'd be looking at a different case. Your Honor, I understand the point. However, after she changed the language from 40 to 50 percent to good probability, she ran it by Justice Management. They said, looks good to us. She vetted it with them. She didn't just pass it on without asking. So therefore, the good probability is Justice's opinion, and in fact, Blake Beach, the CEO of Justice at the time, testified at trial. He believed there was a good probability of getting the North Carolina contract. Under those circumstances, I don't see how there can be a misrepresentation in this case. Could we go to damages for a second? Sure. So the same question I asked before. Is it your position that Sentinel relied on 3333 as the measure of damages at trial? There's no question about it, Your Honor. Excerpt of Record 269. It is the only statute they cite in their section of proposed findings of fact and conclusions of law with respect to damages. All right. Now, let me ask you the same question about mezzanine financing. What is the standard of review that this court has to apply as to the district court's refusal to award that? And was this within the standard of review or an error? Yes, Your Honor. We cited in our brief on this that the standard on this is really whether or not the damages are proximately caused by defendant's conduct, and that is an analysis, proximate cause, you need clear error to overturn. Error of? It's a factual determination. It's a factual determination. It's completely factual. It's completely factual. If the district court had failed to consider mezzanine financing, it's clear that Sentinel requested mezzanine financing, correct? Correct. If the district judge had refused to consider that, that would be an issue of law and we might want to reverse, correct? Well, I think the district judge did consider it. Do you concede that the district or do you argue that the district judge used the correct standard? Correct. The judge considered everything that was presented to them, including interest, and determined that the expert calculations that were done as well as the damages theories that were put forward were excessive and lacking in evidentiary basis. I'm talking now about mezzanine financing. What's your response to Ms. Allison's argument that the district judge made an error of law in refusing mezzanine financing? Okay. So there's no evidence in the record that the court refused to consider that. What the court did was it looked at the damages analysis. The Sentinel put forward at trial that they were damaged in the amount of $5 million plus about $4 million in interest. The $4 million, the interest, the mezzanine financing interest, is based on the $5 million damages conclusion. So when the court threw out the $5 million as being, as the court said, excessive and completely lacking in support, the interest calculation went along with it. So I don't think there was any lack of consideration of it. It's the principal amount upon which the interest was based was thrown out properly by the district court, and the district court decided that you can't. The expert analysis that was used by Sentinel in this case was the court found completely lacking in evidentiary support and improper and factually improper. The court said that Sentinel went into this deal knowing there was a risk that the North Carolina contract would not come through. That's undisputed. It was out for bid, right? The expert analysis that was done by Sentinel's expert basically valued the entire contract at $5 million and subtracted that from the purchase price. The court said you can't do that. The court says that the amount they're seeking is excessive and completely lacking in support since Sentinel knew the North Carolina contract was out for bid and possibly they would not win. The detriment proximately caused can't be the full value of the contract. This is excerpt of record 91. So what the court did was it tried to reasonably evaluate what the value was of the risk of not getting the North Carolina contract. And what it did was it adopted the alternative damages analysis of our expert, Mr. Scholz, who said if you look at the purchase contract, there was a specific paragraph that says if certain contracts, which didn't include North Carolina, if certain contracts don't come through, here is basically the refund we're going to get you, the adjustment we're going to get you on your purchase price. And that came out to a certain percentage. And he applied that. He applied that to the North Carolina revenue and said that's an appropriate number. That number came out to be. That's the $456,000. That number comes out to be $450,000. Assuming we reject your position on liability and we affirm on liability, you make no complaint about that damage award. Correct, Your Honor. In that order, correct. Obviously, our position is that the fraud finding should be reversed. But if Your Honor is firm, then we have no complaint with the damages analysis as done. I'd like to now turn to the other basis for our cross-appeal, if I could, which is that the court improperly determined who was the prevailing party here for purposes of attorney's fees. Here the standard should be, even though generally I'll acknowledge that attorney's fees awards are reviewed under an abusive discretion standard, however, under the EEOC versus Bruno's case, if the court applies an incorrect standard, then that's abusive discretion and this court reviews it de novo. Here, the trial court disregarded California Supreme Court authority to determine that Sentinel was the prevailing party because it found that it had a net monetary recovery on tort claims. That is not what you do in these circumstances. The starting point for any analysis for contractual attorney's fees is who is the prevailing party under 1717. The holding is the party who is determined to be, the statute reads, the party who is determined to be the party prevailing on the contract shall be entitled to reasonable attorney's fees. The California Supreme Court in the Sue case said, we'd examine the legislative history. Determination of prevailing party for purposes of fees is to be made without reference to success or failure of non-contract claims. It further had said, the words, quote, shall be entitled, mean that the party prevailing on the contract receives attorney's fees as a matter of right. The trial court is obligated to award attorney's fees. In this case, there is no dispute. G4S prevailed on contractual claims. There were contractual lawsuit here. We won on that. G4S prevailed on the tort claims. The court in both Sue and Santisa says, for purposes of an attorney's fees award on a contract, when there's a contract involved, the only thing you look at is who prevails on the contract claims. You disregard the tort claims for purposes of a determination of whether or not there's a prevailing party. So it's not a battle between who won on contract and who won on tort, as the district court did here. What actually occurs is you look at 1717, you look at the authority under Sue and Santisa, and whoever won on the contract is entitled to attorney's fees. Here, there's no question that is G4S. The citation to Maynard from the district court, which is a court of appeals case, that case was wrongly decided and is inconsistent with both Sue and Santisa. And that court basically ignored the Civil Code 1717. What case is that? Maynard. Maynard is wrongly decided. Maynard, right. And I'd like to reserve the rest of my time for rebuttal, if I could, Your Honors. All right. Thank you. Thank you. To revisit a couple of points. First, counsel repeatedly referred to the request for information made by Sentinel as a request for management opinion. It actually was a request for management's expectations. I think he's trying to pull it into the non-actionable opinion realm, but I think the exceptions that I discussed with you make it clear that it is actionable, and the trial court clearly found that. I think his discussion of trying to support Ms. Jorgensen's good probability email doesn't work principally because of her very clear credibility problems. But the fact is that she did not pass along what justices' management told her, because Martin, who is justices' management, told her that there was only a 40% to 50% chance that the bid would succeed. So at a minimum, she changed that. She did it for her own purposes, which the court found to be not credible. As to Beach, the fact that Beach said he thought it was a good probability, Beach did not disclose anything that he knew about the technical noncompliance of the bid, and the evidence was undisputed that he did know about it. Nobody mentioned it. Although Martin testified that in telling Jorgensen there was only a 40% to 50% chance, he was taking into account his knowledge and his concern about the noncompliance of the bid. As it relates to the court's question about what we argued on damages, I'd specifically like to refer to the court to excerpts of Record Volume 2 at pages 269 to 270, paragraphs 203 to 204. At that point there, we pointed out that 3333 provides the general measure of damage for torts. We also then quoted from Alliance and Stout, which specifically identify the following correct damage measure, the measure of damages for defrauded parties, out-of-pocket loss, directed to restoring the plaintiff to the position he had before the fraudulent transfer, awards the difference in value at the time of the transaction between what the plaintiff gave and what the plaintiff received. Those are our proposed findings in those paragraphs. I think when we referenced 3333, we emphasized and presented evidence based on 3343. On the attorney's fee issue, I will simply say that the suitcase involved only a contract claim. There was no other tort claim. So whatever the suitcase said about when 1717 applies or not doesn't really help us in the context of the mixed claims here. Santis has held that even if a party did not prevail on its contract claim under 1717, it could still be the prevailing party on its tort claims because 1717 does not apply to the tort claims. And while counsel now argues that Maynard is bad law and was wrongly decided, Maynard, we pointed out, was a key case they relied on in moving for attorney's fees. Thank you. Thank you, counsel. Thank you. Very, very briefly, Your Honor. With respect to the allegation that Mr. Beach did not disclose the technical noncompliance with the North Carolina bid, Mr. Beach understood that. He took that into account in telling Ms. Jorgensen, all in all, I still think we have a good probability of gaining this contract primarily based on the fact that they were the incumbent. So whether it was disclosed or not disclosed is not the issue. The issue is whether it was justice's management opinion. When you consider everything, including the quote-unquote technical noncompliance, there was a good probability and there's no dispute that was Mr. Beach's opinion, both in the e-mails, what he told Ms. Jorgensen and what he testified to at trial. With respect to Civil Code 3333, there's no dispute. That is what was relied upon by Sentinel. That is what they argued to the court, and they cannot now be heard to be backing away from that and to assert a different standard. Finally, with respect to the attorney's fees cases, counsel argues that the suit case is not applicable because it only deals with contract. The holding in the suit case specifically says that when you have a victory on a contract claim, there is no comparison. You do not take into account any other victories in the case on noncontractual claims, on tort claims. Under Civil Code 1717, the only thing you look at is the contract claims to determine who is the prevailing party. Similarly, with Santesis, in that case, while the section that counsel quotes is accurate, it's out of context. What happened in Santesis was that the contractual claim was dismissed prior to trial. Under 1717, that means there cannot be a prevailing party for purposes of attorney's fees. When the contract claim is gone, then you can turn to whether or not a tort claim under a contractual attorney's fees clause might entitle someone to attorney's fees under a sort of a more general, pragmatic litigation objectives determination. That did not happen here. The contract claim was brought, went all the way through trial, G4S prevailed. Under Sioux and Santesis, the court was mandated to award attorney's fees to G4S under 1717. 1717 says, whoever is the prevailing party on the contract shall be entitled to attorney's fees. The court ignored 1717 and counterweighted it against the fact that Sentinel had prevailed on the tort claims. That is not the analysis. Under Sioux and Santesis, if you have contract claims and you have tort claims, for purposes of prevailing party on attorney's fees, the only thing you look at is who prevailed on the contract, and you do not take into account who prevailed on the tort claims. If there's any other questions, thank you very much for your attention. Thank you, counsel. Thank you to both sides for your argument in this case.
judges: Nguyen, Owens, Baylson